BYRNES, Judge.
Sajare Interests, Ltd., (Sajare) appeals a judgment of the trial court awarding $69,-567.55 with legal interest to Esplanade Management, Ltd., (Esplanade) on a demand note payable to Esplanade in the sum of $99,590.58. The judgment also reserved Esplanade's right to proceed against Sajare for the balance of the note and dismissed Sajare’s reconventional demand against Esplanade as well as its third party claim against the New Orleans Federal Savings and Loan Association (N.O.F.). We affirm.
On appeal, Sajare asserts that the trial court erred by not finding that the demand note to Esplanade was part of an alleged credit real estate transaction which Sajare sought to rescind in its reconventional demand. We disagree.
The facts of the case are as follows. In July 1981 George Friedman entered into a purchase agreement with Sam Recile, President of Brian Investments, Ltd., (Brian) to purchase real estate located at 613-617 Esplanade Avenue, New Orleans. This agreement set the price of the property at $330,-000.00 and required Mr. Friedman to make a $30,000.00 cash deposit upon acceptance of the offer, the balance to be secured by a first mortgage in the sum of $300,000.00. The act of sale was to be passed no later than October 15, 1981. Prior to that date, Mr. Friedman assigned his interest in the purchase agreement to his wholly owned corporation, Esplanade. Subsequently, the purchase agreement was extended several times to allow Brian time to remove various liens and mortgages which clouded merchantible title to the property and to seek approval of the sale from the federal bankruptcy court which was conducting involuntary bankruptcy proceedings against Brian.
The final extension set a July 16, 1982, closing date and amended the terms of the agreement to provide an “adjusted price” of $454,873.41 which included the payment and cancellation of $417,373.41 in encumbrances against the property, including satisfaction of a $30,301.51 tax debt owed to the I.R.S. by Brian’s parent company, Sa-jare. The difference between the original sale price of $330,000 and the “adjusted price” of $454,873.41 was apparently meant to be a loan by Esplanade to Brian, to be evidenced by a non-interest bearing note from R-II Properties, an enterprise unrelated to the present litigation. This loan to Brian was evidently needed to pay off the existing mortgages and liens against the property which equaled a sum well beyond the originally contemplated sale price.
The sale was finally consummated by authentic act on July 16,1982, amidst much concern as to whether there were adequate funds to repay Brian’s creditors who held encumbrances against the Esplanade property. The act of sale, as agreed upon that day, provided for a cash sale to Esplanade for the amount of $330,000.00, the receipt of which was acknowledged by Brian. There was also mention in the act of sale that it complied with the order of the bankruptcy court which authorized a credit sale pursuant to the terms of the original purchase agreement. Additionally, the act of sale stated that it satisfied and was in accordance with the original purchase agreement and all extensions thereof.
The vendor’s closing statement shows that after applying the $330,000.00 cash sales price towards satisfaction of the existing encumbrances there was an adjusted shortage due by the vendor, Brian, total-ling $69,567.55. This shortage was paid by Mr. Friedman of Esplanade Investments, Ltd. Additionally, Esplanade gave a six month promissory note for $30,023.03 to the I.R.S. to satisfy the tax debt owed by Sajare. This was done to induce the I.R.S. to release Brian’s interest in the Esplanade property from its parent company’s tax obligation.
In turn, Sajare issued a demand note to Esplanade in the amount of $99,590.58 to repay Esplanade for the $69,567.55 it paid to satisfy the adjusted shortage and the *291 $30,023.03 promissory note Esplanade gave to I.R.S. to satisfy Sajare’s tax debt.
That same day, Esplanade granted a first mortgage on the Esplanade property to N.O.F. to secure an $850,000.00 loan, the proceeds of which were used to pay the purchase price and make improvements to the property. One year later in June 1983, Esplanade made demand upon Sajare for payment of the $99,590.58 note. This and a later demand were dishonored, prompting Esplanade to bring suit on the note.
In reconvention, Sajare assérted that Esplanade’s $30,023.03 note to I.R.S. constituted the credit terms of a partial credit sale of the Esplanade property. Sajare asked the trial court to dissolve the sale on the basis of the alleged non-payment of Esplanade’s note to the I.R.S. which purportedly represented the credit portion of the sale price. Sajare also sued N.O.F. as a third party and demanded that N.O.F. cancel the $850,000.00 mortgage against the Esplanade property.
Resolution of this dispute turns on the interpretation of the act of sale. The characterization of the transaction as a cash or credit sale will directly impact the rights of the parties. C.C. Art. 2561 provides in part that:
“[i]f the buyer does not pay the price the seller may sue for the dissolution of the sale. The right of dissolution shall be an accessory of the credit representing the price ...”
Thus, if the sale is found to be a cash sale, the vendor is without recourse to dissolve the sale on grounds of non-payment of price.
It is uncontested that the authentic act in question purports to evidence a cash sale; the document states this expressly. Unfortunately, the act of sale also contains language which references the prior purchase agreements and, therefore, suggests that the transaction may have been intended as a partial credit sale.
At the outset, we note that the authentic act of sale is full proof of the agreement contained in it against the contracting parties and heirs or assigns unless it is proved to be a forgery. C.C. Art. 1835 (Formerly C.C. Art. 2236). Moreover, parole evidence is not admissible to contradict or go beyond what is contained in the act. C.C. Art. 1848 (Formerly C.C. Art. 2276). Since the authenticity of the parties’ signatures is not at issue in this case, our inquiry into the intent of the parties will be confined to the language of the authentic act.
Examination of the act of sale reveals potentially inconsistent language. On the one hand, it clearly states that the transaction is a cash sale for the sum of $330,-000.00 while on the other hand, it also states that the sale “satisfies and is in accordance with the purchase agreement dated July 15, 1981” as well as the extension of the same — both of which contemplated a sale on credit terms. The July 15, 1981, version of the purchase agreement provides for a cash deposit of $30,000.00 and the remaining $300,000.00 balance to be paid on credit. It is this version that the notary public used in drafting the act of sale to ensure that it complied with the bankruptcy court’s order.
In reconciling the change in terms from a partial credit sale to an all cash sale the notary public testified that although the bankruptcy court had only authorized a credit sale, the cash sale was more valuable to the vendor and consequently, he opined, more agreeable to the bankruptcy court. When asked whether he had seen the July 9, 1982 version of the purchase agreement which set forth an “adjusted consideration” of $454,873.41 the notary public said that he had not.
Although Sajare urges us to find that the July 9, 1982 purchase agreement controlled the act of sale and therefore set the terms on a credit basis, we cannot agree. In our opinion, negotiations over the terms of the sale had not ended when the parties signed the final purchase agreement. This much is obvious upon comparison of that agreement and the act of sale which are inconsistent in almost every respect.
*292 It is the act of sale which documents the conclusion of the negotiation process and embodies the final expression of the parties’ intent. C.C. Arts. 1835 and 1848. For this reason we find that the $330,000.00 consideration, acknowledged as received in the act of sale, constituted full payment of the final sales price and that Esplanade advanced the $69,567.55 payment and gave the $30,023.03 note to the I.R.S. as an accommodation loan to Sajare, repayment of which was evidenced by Sa-jare’s $99,590.58 demand note to Esplanade. We also conclude that this loan arrangement constituted a separate agreement entered into between the parties at approximately the time the sale was passed, but independent of it.
This result is in accord with jurisprudence which holds that a vendor cannot claim a greater consideration than that which he has assented to in an act of sale. Camus v. Rittiner, 209 So.2d 155 (La.App. 4th Cir.1968). Our finding is further supported by caselaw which holds that a sale of immovable property by authentic act wherein receipt of payment is acknowledged by the seller cannot be attacked on the ground that the consideration was not paid, unless the attacking party alleges fraud, mutual error or force, or if lack of consideration is shown by answers to interrogatories or requests for admissions of fact. Brumfield v. Brumfield, 457 So.2d 763 (La.App. 1st Cir.1984); Cordova v. Cordova, 382 So.2d 1050 (La.App. 2nd Cir.1980); Elrod v. Le Ny, 193 So.2d 299 (La. App. 4th Cir.1966).
Having determined that Esplanade’s promissory note to the IRS was not part of the consideration of the sale, we conclude that the trial court correctly denied Sa-jare’s request to dissolve it. We also find that the trial court was correct in granting Esplanade partial judgment on the demand note received from Sajare. Payment of the $69,567.55 was established beyond doubt at trial. However, the $30,000.00 I.R.S. note which we have concluded constituted a portion of the $99,590.38 note sued on had not been paid as of the date of trial and the trial court correctly excluded this amount from its judgment.
For the foregoing reasons the judgment is affirmed at the appellant’s cost.
AFFIRMED.